*Mayor and City Council of Ocean City v. The Washington Post*
No. 774, Sept. Term, 2024
Opinion by Leahy, J.

**Maryland Public Information Act > Personnel Records > "Anton's Law" Amendment**
Anton's Law decreed that personnel records, as a category of records under the MPIA, do not include records relating to an investigation of police misconduct.

**Maryland Public Information Act > Investigatory Records > "Anton's Law"**
Thus, records pertaining to allegations of police misconduct, including investigation and discipline records—once deemed records subject to *mandatory* denials under the above-described personnel records exemption—were redefined and recategorized by the 2021 amendments to GP §§ 4-311 and 4-351 as records subject to *discretionary* denials under GP § 4-351, alongside certain mandatory redactions to protect certain persons and personal information under GP § 4-351(d)(1). In short, by virtue of the amendments to the MPIA under Anton's Law, records relating to any allegation or investigation of police misconduct, including discipline records, are no longer shielded from release under the MPIA as personnel records.

**Maryland Public Information Act > Mandatory Denials > Personnel Records**
Even where the personnel records exemption applies, we have clarified that "the exemption may not be blanketly invoked to shield an entire file if the shielding of only a part of the file would suffice to serve the purpose of the exemption." *Blythe v. State*, 161 Md. App. 492, 519 (2005); *see also* GP § 4-343("[I]f a custodian believes that inspection of a part of a public record by the applicant would be contrary to the public interest, the custodian may deny inspection by the applicant of *that part* of the record[.]") (emphasis added).

**Maryland Public Information Act > Investigatory Records > "Anton's Law"**
With the passage of Anton's Law, the General Assembly expressly removed from the MPIA's personnel records exemption any "record relating to an administrative or criminal investigation of misconduct by a police officer, including an internal affairs investigatory record, a hearing record, and records relating to a disciplinary decision." GP § 4-311(c)(1). The General Assembly did not reclassify these records under GP § 4-351(a)(4) without first removing them from the mandatory exemption under GP § 4-311(a).

**Maryland Public Information Act > Mandatory Redactions**
However, the Supreme Court's opinion in *Maryland Dept. of State Police v. Maryland State Conf. of NAACP Branches*, 430 Md. 179, 195-96 (2013), teaches that other compulsory exemptions and redactions may still apply. More precisely, records that fall within the category defined under GP § 4-311(c)(1), while subject to "discretionary" review under GP § 4-351(a)(4), may also contain documents or portions of documents that are protected from disclosure under other provisions of the MPIA, such as "shielded

records" under GP § 4-327.  Indeed, Anton's Law amended GP § 4-351 to specify that records custodians "shall" redact portions of any such records that contain "medical information[,] . . . personal contact information[,] . . . or information relating to the family" of the subject of the records requested.  GP § 4-351(d)(1).

**Maryland Public Information Act > Use of Force Reports>Burden of Proof**
Ocean City had the burden of proving that including the names of the officers in the Use of Force ("UOF") Reports would have converted them into "personnel records" exempt from disclosure under GP § 4-311(a).

**Maryland Public Information Act > Use of Force Reports**
The UOF Reports, including the names of the officers who filed them, are not exempt from disclosure as personnel records under GP § 4-311(a) because: 1) they are created to meet statutory reporting requirements and not created in a performance review setting; 2) they are not used as personnel records; and, 3) officers do not have a reasonable expectation of privacy in the information contained in the UOF Reports given that the OCPD makes available, upon request, the more detailed Incident Reports that correspond to each UOF Report.

**Maryland Public Information Act > Investigatory Records > "Anton's Law"**
The overarching goal of Anton's Law made plain by the language of the amendments to the MPIA under Anton's Law, is to make records regarding "investigations of police misconduct" publicly available.  GP § 4-311(c).  The circuit court's determination that the UOF Reviews meet the criteria of GP § 4-311(c) aligns with the purpose of Anton's Law and is consistent with PS § 3-514, which requires police departments throughout the state to report annually on every use of force exerted on a citizen by an officer.  The legislative purpose of Anton's Law would be stymied by the review process OCPD employs in use-of-force cases if we read GP § 4-311(c) to apply only to investigations that are based on complaints.

**Maryland Public Information Act > Investigatory Records > Police Misconduct**
The Supreme Court of Maryland has recognized that the public's crucial oversight role is aided by gaining access to records of incidents that do not result in findings of misconduct or result in discipline.  *Balt. Police Dep't v. Open Just. Balt.*, 485 Md. 605, 663-64 (2023) (demonstrating that "the public interest purpose" of disclosing records "intended to assist the public in examining [police] compliance with . . . internal investigatory policies" was "plainly apparent.").

**Maryland Public Information Act > Investigatory Records > "Anton's Law"**
Under Anton's Law, the public is equally entitled to information showing that the UOF Reviews at issue did not result in any investigation within OPS or any disciplinary action.

**Maryland Public Information Act > Investigatory Records > Police Misconduct>Definition**

Although the MPIA does not define police "misconduct," the General Assembly added the definition in the Public Safety Article under a companion bill that, together with Anton's Law and several other bills, formed the Maryland Police Accountability Act of 2021. Public Safety Article, section 3-101(g) defines "police misconduct" as "a pattern, practice, or conduct by a police officer or law enforcement agency" that "depriv[es] persons of rights[,] . . . violat[es] . . . a criminal statute[,]" or "violat[es] . . . law enforcement agency standards and policies." PS § 3-101(g); *see* H.B. 670, 2021 Leg., 442d Sess. We see nothing in this definition that limits the term to include only conduct based on a complaint filed by a citizen or a police officer.

**Maryland Public Information Act > Investigatory Records > "Anton's Law"**

The UOF Reviews memorialize internal chain of command reviews that constitute internal investigations of instances of uses of force by officers in their interactions with the public, placing them within the category of records defined under GP § 4-311(c). Accordingly, the UOF Reviews may not be withheld from public disclosure under the MPIA on the ground that they constitute personnel records.

**Maryland Public Information Act > Investigatory Records > "Anton's Law"**

Anton's Law *requires* review and, if necessary, redaction of the use of force records prior to disclosure. GP § 4-351(d).

**Maryland Public Information Act > Investigatory Records > "Anton's Law"**

To fully comply with the MPIA as amended by Anton's Law, the OCPD records custodian must have an opportunity to make mandatory redactions to the UOF Reviews as instructed by GP §4-351(d)(1). Under GP § 4-301, the records may also be subject to denial and redaction if the records, or any portions thereof, are by law deemed privileged or confidential, or where their inspection would otherwise be contrary to the Maryland Rules, an order of a court of record, or any applicable federal or state statute or regulation. In addition to the mandatory redactions provided for in GP § 4-351(d)(1) and GP § 4-301, the records custodian may also withhold "part of the record" where the "custodian believes that inspection . . . would be contrary to the public interest[,]" GP § 4-343, or where witness information "other than personal contact information" is included. GP § 4-351(d)(2).

Circuit Court for Worcester County
Case No. C-23-CV-22-000289

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 774

September Term, 2024

_____

MAYOR AND CITY COUNCIL
OF OCEAN CITY

v.

THE WASHINGTON POST

_____

Leahy,
Zic,
Eyler, Deborah S.
(Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Leahy, J.

_____

Filed: April 3, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

In response to intensifying public unrest over police brutality cases in Maryland and across the nation, during its 2021 session, the Maryland General Assembly enacted Senate Bill 178, also known as "Anton's Law."[1] S.B. 178, 2021 Leg., 442d Sess. (Md. 2021). The new law was part of a package of comprehensive reforms, enacted under the frame of the Maryland Police Accountability Act of 2021 ("MPAA"), that included the Legislature's repeal of the Law Enforcement Officers' Bill of Rights.[2] H.B. 670, 2021 Leg., 442d Sess. (Md. 2021). The sponsoring senator explained that Senate Bill 178 was "an essential step toward re-establishing community trust in law enforcement officers in Maryland."[3] At the time, records related to police misconduct were mostly classified as personnel records and, therefore, generally not subject to disclosure under the Maryland Public Information Act ("MPIA"), codified at Maryland Code (2014, 2019 Repl. Vol.), General Provisions ("GP") § 4-101 *et seq.* Except for records of a "technical infraction," Anton's Law removed these records from their prior classification as personnel records under the MPIA.

Public access to various police records at issue in this appeal turns on the meaning

---

[1] Senate Bill 178 is named for Anton Black, a college student who died after being restrained by police officers in 2018 in Greensboro, Maryland. *See also* 110 Md. Op. Att'y Gen. 3 at *25 (2025) ("The original impetus behind the General Assembly's 2021 police reform efforts was the murder of George Floyd and similar incidents where members of the public were injured or killed by police officers.").

[2] Five bills were enacted by the General Assembly under the banner of the Maryland Police Accountability Act of 2021. *See Md. Gen. Assembly*, https://perma.cc/B5C8-F3HT, (last accessed Feb. 19, 2026). Together, these bills brought myriad reforms to police departments across Maryland. *See* note 6 *infra.*

[3] Written testimony of Senator Jill P. Carter in Favor of S.B. 178 submitted before the Judicial Proceedings Committee on January 21, 2021.

of certain amendments to the MPIA under Anton's Law. In 2021, the appellee, WP Company LLC d/b/a The Washington Post ("the Post"), sent the Ocean City Police Department ("OCPD") three requests under the MPIA for records relating to the use of force by its officers. First, the Post sought certain "UOF [use of force] Reports" from the OCPD's "BlueTeam" or the "IAPro" programs used to track and capture data and statistics on all use of force occurrences. More specifically, the Post requested "data on uses of force that occurred from January 1, 2016[,] to June 30, 2021." Second, the Post sought "UOF Reviews," and "all records documenting internal reviews" related to two separate use-of-force incidents that occurred in June 2021. And third, the Post requested "copies of all records documenting any and all internal reviews" and investigations into "Lt. Frank Wrench's actions on the night of May 31, 2020, along the boardwalk."

The OCPD produced a spreadsheet of UOF Reports related to the first request but did not include the names of the involved officers on the spreadsheet. The OCPD denied the Post's second request, explaining that the UOF Reviews were exempted from disclosure under the MPIA as "personnel record[s]" and did not qualify as "administrative or criminal investigations of misconduct, internal affairs investigatory records, hearing records[,] or records relating to a disciplinary decision of an officer" under Anton's Law. Similarly, the OCPD denied the Post's third request for documents regarding the May 31, 2020 actions of Lt. Wrench, stating that the only review performed was a UOF Review

which, as a "personnel record[,]" was not subject to "inspection."[4]

On January 17, 2023, the Post filed suit in the Circuit Court for Worcester County against appellant, Mayor and City Council of Ocean City ("Ocean City"), for alleged violations of the MPIA by the OCPD. The Post sought, among other things, an order compelling the full release of the UOF Reports and UOF Reviews responsive to the Post's MPIA requests.

In December 2023, the parties filed cross motions for summary judgment. Following a hearing, the circuit court granted the Post's motion for summary judgment on Counts I and II of the Amended Complaint after determining that neither the UOF Reports nor the UOF Reviews responsive to the Post's MPIA requests were exempt from disclosure under the MPIA as "personnel records," and ordered their full release.

Ocean City timely appealed and presents two questions which we have rephrased:[5]

---

[4] The OCPD also withheld a video of the incident that was included in the UOF Review, citing "privacy" concerns relating to juveniles and others who were "unrelated to the incident captured in the video." In Count III of the Amended Complaint, the Post sought the release of an unedited version of the video. On motion for summary judgment, the circuit court denied Count III "without prejudice." The Post does not challenge that ruling on appeal.

[5] The questions presented by Ocean City in their original form are:

> 1. Did the trial court err when it found, under Anton's Law, that use of force spreadsheets, when including the names of involved officers, are not personnel records and must therefore be disclosed under the MPIA?
>
> 2. Did the trial court err when it found that "use of force review" reports for particular incidents involving force, generated and printed from the Department's use of force database, clearly constituting personnel records but
>
> (Continued)

3

1. Are the OCPD UOF Reports personnel records under the MPIA?

2. Are UOF Reviews, as utilized by OCPD, subject to disclosure under the MPIA as amended by Anton's Law?

We agree with the circuit court's determination that the UOF Reports are not personnel records. Therefore, we hold that the UOF Reports, including the officers' names, are not protected from disclosure under section 4-311 of the MPIA.

Next, the record establishes that the UOF Reviews regarding the June 2021 and May 2020 incidents involving interactions between OCPD and members of the public constitute administrative investigatory records that are, following the enactment of Anton's Law, expressly removed by GP § 4-311(c) from the MPIA's personnel records exemption. The overarching goal of Anton's Law, made plain by the language of the amendments to the MPIA under Senate Bill 178, is to make records regarding "investigations of police misconduct" publicly available.

Although the records at issue are conditionally subject to disclosure under GP §§ 4-343 and 4-351, like all public records, the requests for their inspection by the Post remain subject to denial and redaction if the records, or any portions thereof, are by law deemed privileged or confidential, or where their inspection would otherwise be contrary to the Maryland Rules, an order of a court of record, or any applicable federal or state statute or regulation. GP § 4-301 and §§ 4-304 – 4-341; *accord Md. Dept. of State Police v. Md. State Conf. of NAACP Branches*, 430 Md. 179, 192-96 (2013).

---

not related to any investigation or complaint of misconduct, must be disclosed under the MPIA (and in particular under Anton's Law)?

We affirm the circuit court's determinations that the records at issue are not protected from disclosure as personnel records; however, we vacate the court's order for the full release of the UOF Reviews to the Post, and remand for further proceedings consistent with this opinion.

**OVERVIEW OF THE MPIA AND ANTON'S LAW**

To provide context for our exposition of the record on appeal, we begin with an outline of the statutory framework governing the MPIA and a synopsis of Anton's Law.

***MPIA, Generally***

The MPIA, first enacted in 1970, entitles "[a]ll persons . . . to have access to information about the affairs of government and the official acts of public officials and employees." GP § 4-103(a); *see also A.S. Abell Publ'g Co. v. Mezzanote*, 297 Md. 26, 32 (1983) ("[T]he provisions of the [MPIA] reflect the legislative intent that citizens . . . be accorded wide-ranging access to public information concerning the operation of their government."). According to the Supreme Court of Maryland, the MPIA "provide[s] the public the right to inspect the records of the State government or of a political subdivision within the State." *Glenn v. Md. Dept. of Health & Mental Hygiene*, 446 Md. 378, 384 (2016). Recently, in *Sheriff Ricky Cox v. American Civil Liberties Union of Maryland*, 263 Md. App. 110, 126 (2024), we reiterated that, "at its core, the MPIA is a disclosure statute that is meant to ensure that the government is accountable to its citizens[.]"

Reflecting these principles, "the General Assembly requires that the MPIA be construed 'in favor of allowing inspection of a public record[.]'" *Trs. of Walters Art Gallery, Inc. v. Walters Workers United*, 492 Md. 92, 119 (2025) (quoting GP § 4-103(b));

5

*see also Off. of Governor v. Washington Post Co.,* 360 Md. 523, 544 (2000) (underscoring that the MPIA "establishes a public policy and a general presumption in favor of disclosure of government or public documents") (quoting *Kirwan v. The Diamondback*, 352 Md. 74, 80 (1998)). Specifically, the statute provides:

> (a) *General Right to information.* — All persons are entitled to have access to information about the affairs of government and the official acts of public officials and employees.

> (b) *General construction.* — To carry out the right set forth in subsection (a) of this section, unless an unwarranted invasion of the privacy of a person in interest would result, **this title shall be construed in favor of allowing inspection of a public record, with the least cost and least delay to the person or governmental unit that requests the inspection.**

GP § 4-103(a)-(b) (emphasis added). Section 4-201(a)(1) of the General Provisions Article likewise expresses a presumption in favor of disclosure, stating that, "[e]xcept as otherwise provided by law, a custodian *shall* allow a person or governmental unit to inspect any public record at any reasonable time." (Emphasis added). As the Supreme Court of Maryland instructed, this presumption is "not to be overcome lightly[,]" *Glenn,* 446 Md. at 387, and the MPIA's provisions "must be liberally construed . . . in order to effectuate [the statute's] broad remedial purpose." *A.S. Abell Publ'g Co.*, 297 Md. at 32.

Although "the public is generally entitled to 'access to information about the affairs of government and the official acts of public officials and employees'" under the MPIA, "[i]n some instances . . . the MPIA requires the custodian of a public record to deny access to a record." *Abell Found. v. Balt. Dev. Corp.*, 262 Md. App. 657, 668 (2024) (quoting GP § 4-103(a)). Indeed, the disclosure requirement is limited by numerous exceptions, which the MPIA organizes under three principal categories:

6

> First, the exceptions in Part I generally require a custodian to deny inspection if a source of law outside the MPIA prevents disclosure. GP § 4-301. Second, the mandatory exceptions in Parts II and III require the custodian to deny inspection for specific classes of records and information. *Id.* §§ 4-[3]04 – 4-341. Third, the exceptions in Part IV permit the custodian to exercise discretion as to whether the specified records are to be disclosed. *Id.* §§ 4-343 – 4-356. More than one exception may apply to a public record, and the exceptions are not mutually exclusive. *Off. of the Att'y Gen. v. Gallagher*, 359 Md. 341, 353-54 [] (2000). Finally, Part V of the MPIA contains a "last resort" provision that allows a custodian to deny inspection temporarily and seek approval to continue to withhold a record that otherwise would be subject to inspection. GP § 4-358.

*Trs. of Walters Art Gallery*, 492 Md. at 159-60 (Booth, J. dissenting). Pertinent to this appeal, personnel records fall under Part II and "are largely exempt from disclosure" under the MPIA. *Lamson v. Montgomery Cnty.*, 460 Md. 349, 362 (2018). Under GP § 4-311(a), subject to certain exceptions, a records custodian "*shall* deny inspection of a personnel record of an individual, including an application, a performance rating, or scholastic achievement information." GP § 4-311(a) (emphasis added); *see also Glass v. Anne Arundel Cnty.*, 453 Md. 201, 209-10 (2017) (instructing that personnel records fall under the "mandatory exception" to disclosure under the MPIA).

### *Anton's Law*

On April 10, 2021, the General Assembly voted to override the Governor's veto and enacted Senate Bill 178 into law.[6] *See* 2021 Md. Laws, ch. 62. Anton's Law decreed that

---

[6] The Maryland Police Accountability Act of 2021 is comprised of five separate bills: Senate Bill 178, Senate Bill 71, Senate Bill 600, House Bill 670, and Senate Bill 786. *See Md. Gen. Assembly*, https://perma.cc/B5C8-F3HT, (last accessed Feb. 19, 2026). In addition to amending the MPIA as discussed in this opinion, Senate Bill 178 required that police officers get approval for "certain no-knock search warrant[s]" "in writing by a police

(Continued)

personnel records, as a category of records under the MPIA, do not include records relating to an investigation of police misconduct. More specifically, Anton's Law amended the personal records exemption statute as follows:

**§ 4-311. Personnel records**

> (a) Subject to subsection (b) of this section, a custodian shall deny inspection of a personnel record of an individual, including an application, a performance rating, or scholastic achievement information.
>
> (b) A custodian shall allow inspection by:
>> (1) the person in interest;
>> (2) an elected or appointed official who supervises the work of the individual; or
>> (3) an employee organization described in Title 6 of the Education Article of the portion of the personnel record that contains the individual's:

---

supervisor and the State's Attorney." *Final Bill Text*, S.B. 178, 2021 Leg., 442d Sess. (Md. 2021). Senate Bill 71 required the use of body-worn cameras for police officers who engage with civilians and set out procedures for monitoring and addressing issues regarding uses of force by officers. *Final Bill* Text, S.B. 71, 2021 Leg., 442d Sess. (Md. 2021). Senate Bill 600 established an independent investigative unit within the Office of the Attorney General to investigate "police-involved death[s] of [] civilians." *Final Bill Text*, S.B. 600, 2021 Leg., 442d Sess. (Md. 2021). In addition, Senate Bill 600 banned police departments from acquiring "weaponized . . . vehicle[s,] . . . destructive device[s,] firearm silencer[s,] or [] grenade launcher[s]" from military equipment surplus programs. *Id.* House Bill 670 included several reforms, including, but not limited to, the repeal of the Law Enforcement Officers' Bill of Rights and the requirement that each county establish a police accountability board. *Final Bill Text*, H.B. 670, 2021 Leg., 442d Sess. (Md. 2021). Under Senate Bill 786, the General Assembly returned control of the Baltimore City Police Department to the City of Baltimore. *Final Bill Text*, S.B. 786, 2021 Leg., 442d Sess. (Md. 2021).

On April 9, 2021, Governor Larry Hogan vetoed S.B. 71, S.B. 178 (Anton's Law), and H.B. 670. On April 10, 2021, the General Assembly voted to override the Governor's vetoes and enacted the bills into law. *See* 2021 Md. Laws, chs. 60 and 59; *see also 2021 Reg. Sess., Bills to be Signed by the Governor on April 10, 2021*, *in* Md. Gen. Assembly Publ'n File, 2021 Leg., 442d Sess. (Md. 2021) https://perma.cc/BS6Q-78KC, (last accessed Feb. 19, 2026).

(i) home address;
(ii) home telephone number; and
(iii) personal cell phone number.

**(C)(1) EXCEPT AS PROVIDED IN PARAGRAPH (2) OF THIS SUBSECTION, A RECORD RELATING TO AN ADMINISTRATIVE OR CRIMINAL INVESTIGATION OF MISCONDUCT BY A POLICE OFFICER, INCLUDING AN INTERNAL AFFAIRS INVESTIGATORY RECORD, A HEARING RECORD, AND RECORDS RELATING TO A DISCIPLINARY DECISION, IS NOT A PERSONNEL RECORD FOR PURPOSES OF THIS SECTION.**

**(2) A RECORD OF A TECHNICAL INFRACTION IS A PERSONNEL RECORD FOR THE PURPOSES OF THIS SECTION.**

GP § 4-311 (emphasis added).[7]

---

[7] In 2024, the General Assembly further amended subsection (c) of GP § 4-311 to reflect changes made by Senate Bill 7. S.B. 7, 2024 Leg., 446th Sess. (Md. 2024); *see also* 2024 Md. Laws, ch. 549. In its present form, GP § 4-311(c) reads:

> (C)(1) Except as provided in paragraph (2) of this subsection, **THE FOLLOWING RECORDS ARE NOT PERSONNEL RECORDS FOR THE PURPOSES OF THIS SECTION:**
> **(I) A RECORD RELATING TO AN ADMINISTRATIVE OR CRIMINAL INVESTIGATION OF MISCONDUCT BY A POLICE OFFICER, INCLUDING AN INTERNAL AFFAIRS INVESTIGATORY RECORD;**
> **(II) A HEARING RECORD;**
> **(III) A RECORD OF POSITIVE COMMUNITY FEEDBACK THAT WAS NOT SOLICITED BY THE POLICE OFFICER WHO IS THE SUBJECT OF THE FEEDBACK; AND**
> **(IV) RECORDS RELATING TO A DISCIPLINARY DECISION.**
> (2) A record of a technical infraction is a personnel record for the purposes of this section.

Unless otherwise indicated, throughout this opinion we refer to the version of the MPIA in effect in 2023.

9

Anton's Law also amended GP § 4-351, which allows records custodians to use their discretion when denying access to public records and/or redacting the records before inspection. As amended by Anton's Law, GP § 4-351 provided:[8]

**§ 4-351. Investigations; intelligence information; security procedures**.

(a) Subject to **SUBSECTIONS (B), (C), AND (D)** of this section, a custodian may deny inspection of:

(1) records of investigations conducted by the Attorney General, a State's Attorney, a municipal or county attorney, a police department, or a sheriff;

(2) an investigatory file compiled for any other law enforcement, judicial, correctional, or prosecution purpose;

(3) records that contain intelligence information or security procedures of the Attorney General, a State's Attorney, a municipal

---

[8] As with GP § 4-311(c), the General Assembly's passage of Senate Bill 7 in 2024 also amended GP § 4-351(a). S.B. 7, 2024 Leg., 446th Sess. (Md. 2024); *see also* ch. 549 of the Acts of 2024. Subsection (a) now reads:

§ 4-351
(a) Subject to subsections (b), (c), and (d) of this section, a custodian may deny inspection of:
(1) records of investigations conducted by the Attorney General, a State's Attorney, a municipal or county attorney, a police department, or a sheriff;
(2) an investigatory file compiled for any other law enforcement, judicial, correctional, or prosecution purpose;
(3) records that contain intelligence information or security procedures of the Attorney General, a State's Attorney, a municipal or county attorney, a police department, a State or local correctional facility, or a sheriff; or
(4) records, other than a record of a technical infraction, relating to an administrative or criminal investigation of misconduct by a police officer, including an internal affairs investigatory record, a hearing record, **A RECORD OF POSITIVE COMMUNITY FEEDBACK,** and records relating to a disciplinary decision.
(Emphasis added).

10

or county attorney, a police department, a State or local correctional facility, or a sheriff; or

**(4) RECORDS, OTHER THAN A RECORD OF A TECHNICAL INFRACTION, RELATING TO AN ADMINISTRATIVE OR CRIMINAL INVESTIGATION OF MISCONDUCT BY A POLICE OFFICER, INCLUDING AN INTERNAL AFFAIRS INVESTIGATORY RECORD, A HEARING RECORD, AND RECORDS RELATING TO A DISCIPLINARY DECISION**.

(b) A custodian may deny inspection by a person in interest only to the extent that the inspection would:

(1) interfere with a valid and proper law enforcement proceeding;

(2) deprive another person of a right to a fair trial or an impartial adjudication;

(3) constitute an unwarranted invasion of personal privacy;

(4) disclose the identity of a confidential source;

(5) disclose an investigative technique or procedure;

(6) prejudice an investigation; or

(7) endanger the life or physical safety of an individual.

**(C) A CUSTODIAN SHALL ALLOW INSPECTION OF A RECORD DESCRIBED IN SUBSECTION (A)(4) OF THIS SECTION BY:**

**(1) THE UNITED STATES ATTORNEY;**

**(2) THE ATTORNEY GENERAL;**

**(3) THE STATE PROSECUTOR; OR**

**(4) THE STATE'S ATTORNEY FOR THE JURISDICTION RELEVANT TO THE RECORD.**

**(D) EXCEPT AS PROVIDED IN SUBSECTION (C) OF THIS SECTION, A CUSTODIAN:**

**(1) SHALL REDACT THE PORTIONS OF A RECORD DESCRIBED IN SUBSECTION (A)(4) OF THIS SECTION TO THE EXTENT THAT THE RECORD REFLECTS:**

11

(I) MEDICAL INFORMATION OF THE PERSON IN INTEREST;

(II) PERSONAL CONTACT INFORMATION OF THE PERSON IN INTEREST OR A WITNESS; OR

(III) INFORMATION RELATING TO THE FAMILY OF THE PERSON IN INTEREST; AND

(2) MAY REDACT THE PORTION OF A RECORD DESCRIBED IN SUBSECTION (A)(4) OF THIS SECTION TO THE EXTENT THAT THE RECORD REFLECTS WITNESS INFORMATION OTHER THAN PERSONAL CONTACT INFORMATION.

(E) A CUSTODIAN SHALL NOTIFY THE PERSON IN INTEREST OF A RECORD DESCRIBED IN SUBSECTION (A)(4) OF THIS SECTION WHEN THE RECORD IS INSPECTED, BUT MAY NOT DISCLOSE THE IDENTITY OF THE REQUESTOR TO THE PERSON IN INTEREST.

GP §4-351 (emphasis added).

The MPIA does not define the term "misconduct"; however, with the passage of the

MPAA, House Bill 670, the General Assembly added a definition of "police misconduct"

under Title 3, Subtitle 1, of the Public Safety Article ("PS") of the Maryland Code. *See*

H.B. 670, 2021 Leg., 442d Sess. There, "'police misconduct' means":

> a pattern, a practice, or conduct by a police officer or law enforcement agency that includes:
> (1) depriving persons of rights protected by the constitution or laws of the State or the United States;
> (2) a violation of a criminal statute; and
> (3) a violation of law enforcement agency standards and policies.

PS § 3-101(g) (2021).

Prior to the passage of Anton's Law, our jurisprudence was "clear" that records

"pertain[ing] to discipline of an employee[,]" including a police officer, were "'personnel

records' under the [MPIA,]" and therefore barred from disclosure. *Md. Dep't of State*

12

*Police v. Dashiell*, 443 Md. 435, 458 (2015); *see also Montgomery Cnty. v. Shropshire*, 420 Md. 362, 381 (2011) (finding that internal affairs records involving officer discipline constitute personnel records under the MPIA). Thus, records pertaining to allegations of police misconduct, including investigation and discipline records—once deemed records subject to *mandatory* denials under the above-described personnel records exemption—were redefined and recategorized by the 2021 amendments to GP §§ 4-311 and 4-351 as records subject to *discretionary* denials under GP § 4-351, alongside certain mandatory redactions to protect certain persons and personal information under GP § 4-351(d)(1). More broadly, the MPIA provides, under GP § 4-343, that a records custodian "may deny inspection" of a public record "if [the] custodian believes that inspection . . . of a public record . . . would be contrary to the public interest[.]" In short, by virtue of the amendments to the MPIA under Anton's Law, records relating to any allegation or investigation of police misconduct, including discipline records, are no longer shielded from release under the MPIA as personnel records.

## BACKGROUND[9]

Having reviewed the framework of the MPIA as it relates to this appeal, as well as the setting and substructure of Anton's Law, we now turn to the factual and procedural history of the police records at issue in this appeal.

---

[9] The following facts are adduced from the evidence presented by Ocean City and the Post in support of their motions for summary judgment.

13

### *OCPD's Policy Regarding Use of Force*

At all times relevant to the instant case, the OCPD's policy has defined the use of force as follows:

> The amount of effort required by police to compel compliance from a person. This applies to any use of force occurring while the officer is acting in an official law enforcement capacity; to include undercover, plain clothes, or uniform assignments whether on-duty or off-duty. The use of a firearm by police officer(s) to compel compliance with verbal commands (i.e. high-risk traffic stop) does require a report of force under this policy.

A use of force may involve physical restraints, pepper spray, "[c]onducted [e]lectrical [w]eapon[s,]" "[i]mpact [w]eapons[,]" and/or firearms. On the other hand, use of force does not include: "handcuffs when used as a restraint in arrest and transport activities, transport by vehicle; physical removal of peacefully resisting demonstrators; display of a firearm[] (un-holstering or depressed weapon position); presence of police officers, mounted or canine units, or police issuance of tactical commands." The OCPD's policy requires that "all uses of force [ ] be reported in a timely, complete, and accurate manner" and be "reviewed by both supervisory and command personnel[.]" Officers must document each use-of-force event in an "Incident Report" (more on that later),[10] and a UOF Report.

---

[10] At the time of the underlying MPIA requests, Maryland Code (2003, 2016 Repl. Vol.), Public Safety Article ("PS") § 3-514 required police departments throughout the state to create incident reports detailing every use of force exerted on a citizen by an officer and provide an annual reporting of those events to the Maryland Police Training and Standards Commission. The statute provided, in relevant part: "Each law enforcement agency shall require a police officer who was involved in a use of force incident in the line of duty to file an incident report regarding the use of force by the end of the officer's shift unless the officer is disabled." In 2022, the statute was amended to include criteria for the information included in the incident reports. *See* ch. 508 of the Acts of 2022.

The OCPD uses two software programs to create, store, and review use of force data for UOF Reports. The OCPD initially uses the BlueTeam program to "record all [use-of-force] occurrences." Officers enter the required information into the BlueTeam program, creating a UOF Report. A UOF Report "specifically [and] narrowly focuses on [a] specific use of force incident[,]" and gathers basic datapoints including the "[d]ate [and] [t]ime of occurrence[,] [a]ddress of the occurrence[,]" the name of the officer involved in the use of force, the citizen(s) involved in the use of force, the type of force deployed, and any injury occurring as a result of the use of force. In the response to the Post's requests, the OCPD produced the UOF Reports in the form of a spreadsheet, organizing into columns and rows the data that was entered by officers.

Once the information is entered by an officer into the BlueTeam program, the UOF Report "electronically moves up the OCPD chain of command . . . for review" and "for confirmation that the use of force was compliant with [the OCPD] policy."[11] This begins the UOF Review process. When reviewing a use-of-force incident, the reviewing officers watch footage from both in-car cameras and body-worn cameras. If the reviewing officers determine that the use of force does not comport with OCPD policy, they "enter comments as to why they believe that the use of force did not comply[.]" Once the UOF Report moves up the chain of command in BlueTeam, it is then transferred to a second program, IAPro—the program that the OCPD uses for statistical reporting. At that point, the UOF Review

---

[11] Between January 1, 2016, and May 2023, OCPD officers completed 1,687 UOF Reports in the BlueTeam program.

process continues when a UOF Report is reviewed by a supervising officer.  After the supervising officer determines whether the use of force complied with OCPD policy, the UOF Report goes to the Office of Professional Standards ("OPS"), which reviews the use of force for compliance with the OCPD policy.

### *The Post's UOF Report Request*

On July 15, 2021, Steven Thompson, a reporter from the Post, emailed the OCPD his MPIA request for the UOF Reports.  The email stated, in relevant part:

> Please accept this request under the [MPIA] for the data entered by your agency into Blue Team's use of force module.
>
> Please limit the timeframe to data on uses of force that occurred from Jan. 1, 2016 through June 30, 2021.
>
> Please include all publicly releasable fields for each use of force, including but not limited to:
> Date
> Name(s) of officer(s) involved
> Badge number(s) of officer(s) involved
> Incident number
> Incident type (ie assault, disturbance, traffic stop etc)
> Use of Force Type (ie bodily force, OC Spray, Impact Weapon etc)
> Body part used for force (ie hands/fist, knee, feet etc)
> Use of Force Level Use of Force Reason (ie suspect resistance, self defense, gain tactical advantage etc)
> Address of incident
> District of incident
> Name of subject/individual (against whom force was used)
> Race of subject/individual
> Gender of subject/individual
> Age of subject/individual
> Date of birth of subject/individual
> Subject/individual arrested (ie yes or no)
> Subject/individual behavioral health indicators (ie under the influence, crisis etc)
> Violent crime charges (ie yes or no)
> Incident-related charges (ie yes or no)

16

Charge(s) type(s)

Please provide the data in an electronic, structured-data, machine-readable format such as a csv file. I am also requesting all record layouts and data dictionaries that accompany the data.

According to the OCPD, this was the first request that it had ever received under the MPIA for the disclosure of UOF Reports. The OCPD initially replied that the response would take longer than ten days, given the volume of the records requested.[12] After further communications with the OCPD, Thompson narrowed his initial request in an email dated August 16, 2021:

> I may have found something that will work, I'd like to alter my request to make it for just these fields from IAPro:
>
> IA#
> Date Received
> Date Occurred
> Involved Officer(s)
> Allegation(s)/Force Type(s)
> Summary
> Division Category Flag
> RMS/CAD#
> Incident type
> Due Dt
> Completed Dt
> Inv Assigned
> Bureau
> Unit
> Squad
>
> My understanding is that data with these fields can be obtained from the main interface of IAPro in Reports mode.

---

[12] The MPIA requires that if a records custodian believes it will take more than 10 working days "to produce the public record," then the custodian shall, "within 10 working days after receipt" of a request, indicate in writing or by electronic mail the amount of time anticipated to produce the record, an estimate of the range of fees to be charged, and the reason for the delay. GP § 4-203(b)(2).

17

The OCPD responded to Thompson's amended request with spreadsheets generated by IAPro without the names of the officers involved in the UOF incidents. In the accompanying letter, the OCPD explained:

> [T]he involved officer(s) name(s) are redacted, along with any open [use of force] reviews during the requested time frame. Pursuant to GP § 4-311, a custodian shall deny inspection of a personnel record of an individual, including an application, a performance rating, or scholastic achievement information. Personnel records include records related to hiring, discipline, promotion, dismissal, or any other matter involving an employee's status. Providing the name of the officer involved specifically identifies an officer and relates to a review of their performance. There is a significant public interest in preserving the confidentiality of the [use of force] reviews performed on police officers.

Thompson asked OCPD to reconsider the redaction of the involved officers' names:

> I understand the position that information about use of force <u>reviews</u> might currently be subject to the MPIA's mandatory exception from disclosure regarding personnel records (although I believe that position will be insupportable after Oct. 1, when the law changes regarding police disciplinary files). **However, I am not seeking, and these spreadsheets do not contain, information about these reviews. These spreadsheets contain only factual information about uses of force, much like an arrest database contains factual information about arrests. Neither amount to personnel information involving an officer's performance.**
>
> **Identical information as that in the spreadsheets is stored by the department in the form of incident reports regarding use of force created in compliance with Md. Code, Pub. Safety § 3-514. The department has previously released such reports to me in response to an MPIA request**, correctly assessing that it would not be appropriate to withhold them, or to redact officer names from them.

(Underline in original, bold emphasis added.) On October 25, 2021—just weeks after Anton's Law took effect—the OCPD denied Thompson's reconsideration request, stating "[o]ur stance on releasing the names [of the officers] remains the same." The OCPD further explained:

18

SB 178, codified in GP § 4-311, states that administrative or criminal investigations of misconduct of an officer, internal affairs investigatory records of an officer, hearing records of an officer and records relating to a disciplinary decision of an officer are not personnel records and may not use [sic] the personnel exception under the Act.

**Use of force reviews are not administrative or criminal investigations of misconduct, internal affairs investigatory records, hearing records or records relating to a disciplinary decision of an officer. Use of force reviews are completed for every use of force to determine if the use of force complied with policy, thus evaluating the officer's performance. The reviews are used for training. No discipline is noted in a use of force review. If discipline may be needed related to a use of force, an internal affairs file is opened (which has its own file number), the matter is investigated, and a conclusion is reached. Similarly, any complaint of excessive force would be handled through an internal investigation file. A use of force review is not encompassed in the changes to the law predicated by SB 178**.

(Emphasis added).

### *The Post's UOF Review Request*

On October 13, 2021, Thompson emailed the OCPD with another MPIA request, seeking "all records documenting internal reviews[,]" including, but not limited to, "use of force reviews" related to two incidents that occurred on the Ocean City boardwalk in June 2021. The first incident took place on June 6, 2021, and resulted in the arrest of one young man. The second incident, involving the arrest of five young men, took place on June 12, 2021. These use-of-force incidents involved encounters between OCPD officers and unarmed teenagers who were shocked by Tasers. After the incidents garnered significant public attention, the OCPD released a statement saying that at least one of the incidents was "being investigated by the Office of Professional Standards." A September 2021 email between Ocean City Mayor Richard Meehan and the office of U.S. Senator Chris Van

Hollen revealed that the FBI conducted its own inquiry and found that the officers did not violate anyone's civil rights. Mayor Meehan assured the senator's office that a "'thorough multi-level OCPD internal review' had concluded the officers' uses of force were reasonable and within policy."

Thompson highlighted in his MPIA request that,

> [a]s of Oct. 1, 2021, with the passage into effect of SB 178, internal affairs and conduct review files are no longer personnel records under the law. In approving SB 178 after extensive public discussion and debate, Maryland's legislature recognized that such records are of substantial interest to the public, because citizens have an interest in potential misconduct by those with powers of arrest and seizure, and because information about disciplinary proceedings allows citizens to assess the quality and integrity of police misconduct investigations.

Initially, OCPD misunderstood Thompson's request to seek documentation regarding an FBI inquiry into the incidents that Mayor Richard Meehan had mentioned in his correspondence with Senator Chris Van Hollen's office. The OCPD informed Thompson that "[n]either the Department nor the Town have the FBI inquiry records." Thompson clarified that he requested "all records documenting internal reviews" involving the two use-of-force incidents in June 2021, not just records of reviews "mentioned by the [M]ayor." On November 12, 2021, the OCPD denied Thompson's request for the UOF Reviews, stating that they are personnel records. As in its prior response to Thompson's UOF Reports request, the OCPD reiterated:

> **Use of force reviews are not administrative or criminal investigations of misconduct, internal affairs investigatory records, hearing records or records relating to a disciplinary decision of an officer.** Use of force reviews are completed for every use of force to determine if the use of force complied with policy, thus evaluating the officer's performance. **The reviews are used for training. No discipline is noted in a use of force**

**review.** If discipline may be needed related to a use of force, an internal affairs file is opened (which has its own file number), the matter is investigated, and a conclusion reached. Similarly, any complaint of excessive force would be handled through an internal investigation file. A use of force review is not encompassed in the changes to the law predicated by SB 178.

(Emphasis added).

### The Post's Request Regarding Lt. Frank Wrench

On November 12, 2021, Thompson emailed the OCPD with a third MPIA request. This request sought "copies of all records documenting any and all internal reviews, external reviews, use of force reviews, administrative reviews, administrative investigations, external investigations, and/or internal affairs investigations of Lt. Frank Wrench[.]" Thompson also requested "copies of all evidence considered during any review, inquiry, or investigation[.]" An OCPD Incident Report dated May 31, 2020, notes that Lt. Wrench "punch[ed]" a young man who "yelled at" him on the Boardwalk. Lt. Wrench eventually "placed [the young man] in a maneuver commonly referred to as 'headlock.'" Newspapers reported on the incident and a video recorded by a witness circulated on social media. Thompson pointed to the "passage into effect of S.B. 178" as justification for his request for the records, citing the "legislature['s] recogni[tion] that such records are of substantial interest to the public, because citizens have an interest in potential misconduct by those with powers of arrest and seizure and because information about disciplinary proceedings allows citizens to assess the quality and integrity of police misconduct investigations." On December 13, 2021, the OCPD responded, stating that it did not have records regarding any "internal reviews, external reviews, administrative reviews, administrative investigations, external investigations and/or internal affairs investigations"

21

responsive to Thompson's request. The OCPD "den[ied] inspection" of the responsive UOF Review, claiming, "[a] use of force review is not encompassed in the changes to the law predicated by SB 178."

### *The Lawsuit and Summary Judgment*

The Post filed the underlying lawsuit against Ocean City in the Circuit Court for Worcester County on January 17, 2023, seeking to compel, among other things, the OCPD's production of the unredacted UOF Reports and the UOF Reviews.[13] Ocean City filed an answer, claiming that any withholding of requested records was consistent with the MPIA.

After serving and responding to interrogatories and requests for production of documents, and after taking depositions, the parties filed cross-motions for summary judgment in December 2023. In his affidavit filed in support of Ocean City's motion, Lt. Frank Soscia outlined the OCPD's policy regarding the UOF Reports and the UOF Reviews as summarized above. In addition, Lt. Soscia explained the review process that is triggered by the BlueTeam program when one officer reports fifteen or more uses of force within a one-year period. During this review, an OPS official forwards all related reports to OCPD's Defensive Tactics Coordinator to determine if "each [use-of-force] incident conforms with [OCPD] policy."[14] Following the review by OCPD's Defensive

---

[13] Initially the Post filed the complaint against the OCPD but later amended the complaint to substitute The Mayor and the City Council of Ocean City.

[14] The record discloses that the BlueTeam program prompted this enhanced review thirty-six times between January 1, 2016, and May 2023.

22

Tactics Coordinator, an OPS official reviews the file for completeness. Lt. Soscia reiterated that this escalated review process and the resulting documentation "are not records of administrative or criminal investigations of misconduct."

In support of its motion for summary judgment, the Post included an affidavit from Thompson and articles attached to that affidavit demonstrating Thompson's "[extensive reporting] on police issues." The articles detailed several of OCPD's use-of-force incidents that occurred between 2016 and the summer of 2021—corresponding to the timeframe of the Post's records requests. The Post articles claimed that the officers in these use-of-force incidents deployed tasers on "unarmed teens[,]" "repeatedly kneed [unarmed teens] in the rib cage," and punched citizens in the face. Elected officials reportedly called videos of one of these incidents "'disturbing'" and "'painful.'"

The Post also included the transcript from Lt. Soscia's September 6, 2023, deposition, in which he elaborated further on use-of-force data collected by the OCPD. Lt. Soscia stated that, during UOF Reviews, the officers review footage from both "in-car cameras" and "body-worn cameras." The supervising officers also review the corresponding Incident Report. If, during any review of the UOF Report, the Office of Professional Standards determines that an officer's actions violated OCPD policy, an internal affairs investigation is opened "with a separate internal affairs number assigned to it." Uses of force warranting investigation are "referred to the Police Accountability Board." Lt. Soscia underscored, once again, that UOF Reviews do not contain information about disciplinary measures resulting from a use of force. In fact, the decision to enact disciplinary measures does not reside with OPS. OPS can make recommendations as to

23

potential "punitive measures" for the offending officer—anything from "reprimands" to "termination"—but the Police Accountability Board makes the final decision.

*UOF Report / Incident Report*

During his deposition, Lt. Soscia explained the differences between a UOF Report and an Incident Report. Following every use-of-force event, the officer(s) involved must complete both a UOF Report and an Incident Report, although an officer's supervisor may complete the Incident Report if the officer is unable to do so. As described above, a UOF Report is created when an officer enters data into the BlueTeam program via specific data-entry fields in the program. That data is then accessed through the IAPro database. When creating the UOF Report, officers select data to enter from "pick list[s]" in the BlueTeam program. Although witness information may be added to the UOF Report, there is "no section for any kind of witness statements" in a UOF Report, nor does the officer "attach any documents" to the UOF Report. In fact, Lt. Soscia explained, "unless the [UOF Report] is specifically at issue with . . . [a] policy violation[,]" the UOF Report "would [not] be included in . . . [an] investigatory file."

Lt. Soscia described the Incident Report as a much more inclusive document stating that it "speaks to the totality of the events." Incident Reports "contain general descriptions of the events that occurred[,]" including the "facts and circumstances" involved. Lt. Soscia described the Incident Report as "giv[ing] full context to the event's facts and circumstances." Incident Reports also include the names of all officers involved in the incident. Lt. Soscia clarified that, while officers do not attach files to the UOF Report

24

when entering the data in the BlueTeam program, once the UOF Report is in IAPro, he attaches the Incident Report to the UOF Report.

By all accounts, the Incident Report created after a use-of-force incident provides far more information than the UOF Report. The Incident Report provides officer names, detailed narratives of the events, and the context surrounding the officer's actions. Although the Incident Reports created by OCPD officers contain more detail, narrative, and identifying information than their UOF Report counterparts, the OCPD has provided Incident Reports to the public in response to MPIA requests. For example, the OCPD provided the Post with the unredacted Incident Report relating to the May 31, 2020, incident involving Lt. Wrench.

### The Memorandum Opinion

On May 24, 2024, following a hearing, the circuit court issued a memorandum opinion granting, in part, and denying, in part, the Post's motion for summary judgment. At the outset, the court observed that the parties agreed there was no genuine dispute of material fact and, therefore, disposition by way of summary judgment was appropriate. The court remarked that the Maryland General Assembly "passed Anton's law in the wake of several high-profile incidents of police use of force, including the death of Anton Black[.]" Because the MPIA is "to be construed in favor of permitting inspection of public records," the court noted that "in cases where a custodian denies inspection of public records, the defendant bears the burden in sustaining the denial." (Internal citations omitted.)

25

Starting with Count I of the Amended Complaint concerning the UOF Reports, the court determined that the reports fell outside the definition of "[q]uintessential personnel records" intended by the Legislature.[15] Although the court considered the "various uses" of UOF Reports offered by Ocean City, including "documenting and reporting certain encounters with the public and . . . analyzing the data to identify general trends[,] training[,] and equipment needs," it concluded that "the primary purpose of the collection and compilation of the [UOF] data at question [was] to comply with" the mandate under PS § 3-514 that all law enforcement agencies require officers to file an incident report when involved in a use-of-force incident. The court explained:

> The evidence is clear that the UOF Reports consist of information required under [PS § 3-514], and other general administrative data, that an officer enters into data entry fields within the Blue Team Use of Force module. The type of information includes location, the type of force used, the type of encounter, whether any injuries [sic] sustained, etc. There is no provision for the officer to provide a narrative of the encounter and the information collected is fairly characterized as basic, factual, straightforward and objective data emanating from a job-related event involving an officer and a member of the public. The narrative is set forth in the incident report.

The circuit court concluded that the UOF Reports do not "share any significant similarities to any document that is typically considered a personnel record." Instead, UOF Reports "concern public actions by agents of the State concerning affairs of government, which are exactly the types of material the [MPIA] was designed to allow the public to see." (Quoting *Md. Dep't of State Police v. Md. State Conf. of NAACP Branches*, 190 Md.

---

[15] It is important to note, as the circuit court did in its Memorandum Opinion, that "the MPIA does not provide a definition for personnel records so we must rely on general definitions developed by caselaw to determine if the exemption applies to the factual scenario at hand[.]"

App. 359, (2010), *aff'd*, 430 Md. 179, (2013)). Lt. Soscia's testimony that "UOF Reports . . . have never been used to counsel or discipline an individual officer" further persuaded the circuit court that UOF Reports "do not directly pertain to an officer's job performance," and are therefore not personnel records. Citing *Administrative Office of the Courts v. Abell Foundation*, 252 Md. App. 261, 263 (2021), *aff'd*, 480 Md. 63 (2022), the court also found that "[t]he inclusion of an officer's name in the report does not somehow convert an otherwise routine administrative report into a personnel record."

Turning to Count II, the court acknowledged that GP § 4-311, as amended by Anton's Law, "does not provide a clear definition of 'administrative or criminal investigation of misconduct by a police officer,' or 'disciplinary decision[,]'" leaving "the door somewhat open for OCPD to argue that the language of the statute is not as broad as the sweeping statutory purpose behind Anton's Law." But the court underscored that the UOF Reviews relating to the three "highly publicized" use-of-force incidents involving teenagers on the boardwalk and Lt. Frank Wrench were "the only internal reviews that were performed in relation to the subject incidents."

The court identified that the "analysis of OCPD's UOF Reviews must necessarily begin with its own Standard Operating Procedures set forth in SOP-ADM 006" dated June 14, 2016. The court highlighted the following passage with the headline "Reporting & Documenting Force" from that SOP:

> In the course of providing police services to the community police officers are often faced with situations where uses off [sic] force are necessary, appropriate and unavoidable. The authority to use force carries with it the need for accountability in order to safeguard the rights of the public and preserve the integrity of [the OCPD] and its employees. Therefore, all uses

27

of force shall be reported in a timely, complete, and accurate manner by the involved employees and shall be reviewed by both supervisory and command personnel as described in this policy.

The court observed that the above "policy pronouncement" directs OCPD as to "how the UOF Reviews should be interpreted" and that it was "strikingly similar to the purpose of Anton's Law." The circuit court was, therefore, "surpris[ed]" that Lt. Soscia testified during his deposition that "he has never seen any officer in the chain of command review opine that a use of force did not comply with departmental policy," and was "unaware of any disciplinary action taken or investigations opened as a result of UOF Reviews." The circuit court found that the lack of disciplinary actions resulting from UOF Reviews "indicates that the UOF Reviews deviate in practice from that which is contemplated by the clear language of and the policy behind SOP - ADM 006." While the use of UOF Reviews may deviate from policy, "[t]he fact that the [UOF Review] process generally, and the OPS specifically, [has] not been used to [its] full investigatory and disciplinary capacity does not negate [the process's] inherent investigatory and disciplinary authority."

The court rejected the OCPD's argument that the UOF Reviews do not constitute "records relating to an administrative or criminal investigation of misconduct by a police officer" under GP § 4-311(c) because there was never a formal "investigation" opened into the three use-of-force incidents at issue, explaining:

> OCPD acknowledges that if a formal complaint had been filed in any of the three incidents, the UOF Reviews would have become part of the Internal Affairs Investigation file, and, as a result, subject to disclosure under Anton's Law. . . . [I]f OCPD's logic is correct, the status of the UOF Reports as exempt from disclosure under the MPIA would hinge solely on whether there

28

has been a civilian complaint filed against an officer. For if a civilian complaint is not filed, the UOF Reports will be exempt from disclosure unless one of the supervising officers finds that the use of force deviates from policy[,] or OCPD or any of its officers initiates a formal complaint. **Thus, in the absence of a civilian complaint, OCPD, in its sole prerogative, determines whether important UOF Reviews are exempt from public scrutiny. Such an outcome would not foster "accountability in order to safeguard the rights of the public and preserve the integrity of The Department and its employees." To allow non-disclosure would frustrate the purpose of both SOP – ADM 006 and Anton's Law.**

(Emphasis added.)

In sum, the circuit court ordered Ocean City to produce "the requested UOF Reports and UOF Reviews as requested in the Amended Complaint within thirty [] days from the date of" the Order. As mentioned previously, the court denied the Post's motion on Count III, and also denied the Post's request for attorneys' fees.

Ocean City timely noticed this appeal on June 20, 2024.

## DISCUSSION

We combine our presentation of the two categories of records at issue as our analysis of each rests on the same statutes and legal principles.

### A. Parties' Contentions

Ocean City contends that UOF Reports and UOF Reviews are personnel records that must be withheld under the MPIA, "provided such records are not and do not become part of records of administrative or criminal investigations or misconduct" which, Ocean City admits, would render the records subject to disclosure under Anton's Law. (Emphasis removed).

29

Ocean City asserts that "use of force reports and spreadsheets showing [the] involved officer[s'] identities, as generated and printed from the Department's use of force database, [are] properly deemed part of OCPD personnel records since they are maintained, kept, and used by the Department in connection with evaluation of individual officer performance." Because UOF Reports are personnel records and not part of a misconduct investigation, Ocean City avers, the MPIA requires the records custodian to withhold the reports. However, the redacted UOF Reports provided to Thompson by OCPD anonymize the records sufficiently to permit disclosure and prevent the public release of personal employee information. Ocean City argues that, because mandatory reporting under PS § 3-514 does not require the inclusion of officer names, officer names are not required in records disclosed under the MPIA. Ocean City analogizes this case to *Baltimore Action Legal Team v. Off. of State's Att'y of Baltimore City*, 253 Md. App. 360 (2021), and highlights that in that case, this Court acknowledged that a list of police officers, depending on how it was used and constructed, could constitute a personnel record under the MPIA.

Similarly, Ocean City argues that UOF Reviews are not related to any investigation —internal or otherwise—and have "no direct or implicit connection to police misconduct, alleged police misconduct, or any complaint or investigation of police misconduct." Ocean City asserts that records regarding officer misconduct and related investigations "exist separately and independently from the OCPD's IAPro/BlueTeam databases." The UOF Reviews, therefore, are separate and distinct records, wholly unrelated to the investigation records covered under Anton's Law. According to Ocean City, the trial court's ruling extended beyond the three requests by the Post. Ocean City presses, "[t]he statute, read

properly, simply does not sweep so broadly as the trial court's ruling here – which is, in essence, that all Departmental personnel records related to any review of police officer performance/conduct" are subject to disclosure under Anton's Law, "even where the review is occurring in the absence of any charge, complaint, claims, suspicion, or investigation of *misconduct.*"

The Post counters that "the purpose of Anton's Law is to increase transparency of police conduct and strengthen law enforcement's accountability to the public[,]" and insists that the new law "makes records of officer investigations available to the public regardless of whether the investigation ultimately resulted in a finding of misconduct or imposition of any discipline." The Post highlights one of its own articles reporting that Senator Jill P. Carter explained, during a committee work group meeting, that, "'If we only focus on sustained complaints, we really won't get to the meat of what is going on with these internal processes.'" (Quoting from Steve Thompson, *After decades of secrecy, Maryland might make police disciplinary records public*, The Washington Post (March 5, 2021, 7:22 p.m.)). Citing *NAACP Branches*, 190 Md. App. at 368, the Post argues that officers "have no reasonable expectation of privacy in the information that is contained in UOF Reports, since, by definition, the reports describe a use of force during an interaction between an officer and a member of the public."

The Post stresses that UOF Reports are not personnel records because the reports contain only information about uses of force, not personnel information about the officers. Further, unlike typical personnel records, UOF Reports are not "in any officer's individual employee file." The Post emphasizes that "[n]o evidence supports the [OCPD's]

31

conclusory assertion that UOF Reports were personnel records because they are 'used in connection with training and departmental review of officers' performance.'" While the Post acknowledges that a UOF Report arises out of an officer's employment, the Post argues that fact alone does not make the report a personnel record. The OCPD's refusal to produce the UOF Reports with the officer names, says the Post, "was at odds with their past practice of producing similar information in response to other requests from Mr. Thompson." The Post points to the fact that the OCPD has produced Incident Reports which include the officers' names, stating that "[t]he [OCPD] has not provided any explanation why it insisted on removing officer names from the UOF Report spreadsheets when they would produce the underlying incident reports that disclose even more detail about individual, identified officers than the UOF Reports."

The Post argues that, because a UOF Review reflects an assessment by the OCPD whether an officer's use of force complied with or violated OCPD policy, "the review plainly 'relat[es] to an administrative . . . investigation of misconduct by a police officer.'" (Quoting GP § 4-311(c)(1)). Moreover, the Post contends that Anton's Law allows for the unredacted disclosure of the UOF Reviews in this case because they constitute the "only internal reviews" of the incidents in question. In the Post's view, the fact that the UOF Reviews do not reflect or involve disciplinary action taken against the officers does not mean the UOF Reviews are not investigatory records.

### B.    Legal Framework

When, as in the instant case, the parties and the trial court agree that there is no genuine dispute as to any material fact, we review the trial court's grant of summary judgment without deference. *Trs. of Walters Art Gallery, Inc. v. Walters Workers United*, 492 Md. 92, 119 (2025). In other words, we "'examine[] the same information from the record and determine[] the same issues of law as the trial court.'" *Miller v. Bay City Prop. Owners Ass'n, Inc.*, 393 Md. 620, 632 (2006) (quoting *PaineWebber Inc. v. East*, 363 Md. 408, 413 (2001)); *see also Balt. Action Legal Team*, 253 Md. App. at 378 (explaining that appellate courts take an independent review of the record to determine if the moving party is entitled to judgment as a matter of law). In doing so, we ordinarily consider "'only . . . the grounds relied upon by the [circuit] court[,]'" *Thomas v. Shear*, 247 Md. App. 430, 448 (2020) (quoting *Hamilton v. Kirson*, 439 Md. 501, 523 (2014)), and "'review the facts, and all inferences therefrom, in the light most favorable' to the nonmoving party." *Prince George's Cnty. v. The Washington Post Co.*, 149 Md. App. 289, 304 (2003) (quoting *Lovelace v. Anderson,* 366 Md. 690, 695 (2001)).

In determining whether the records at issue are exempt from public disclosure under the MPIA, our analysis must "'begin with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology.'" *Balt. Police Dep't v. Open Just. Balt.*, 485 Md. 605, 646-47 (2023) (quoting *Blackstone v. Sharma*, 461 Md. 87, 113 (2018)). When construing a statute, "[w]e neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute[.]" *Lockshin v. Semsker*, 412 Md. 257, 275 (2010).

Our goal, when interpreting a statute, is to "ascertain and effectuate the actual intent of the General Assembly in enacting the law under consideration." *Matter of Collins*, 468 Md. 672, 689 (2020). Thus, we "do not 'read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone.'" *Open Just. Balt.*, 485 Md. at 647 (quoting *Lockshin*, 412 Md. at 275). Instead, "the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Lockshin*, 412 Md. at 276. We also "'check our interpretation against the consequences of alternative readings of the text[.]'" *Rowe v. Md. Comm'n on Civil Rights*, 483 Md. 329, 343 (2023) (quoting *Bell v. Chance*, 460 Md. 28, 53 (2018)). Finally, we "often review legislative history to determine whether it confirms the interpretation suggested by our analysis of the statutory language." *Open Just. Balt.*, 485 Md. at 647.

Earlier in this opinion we explained the long-recognized presumption, expressed in the MPIA and our decisional law, in favor of disclosure of public information held by our State government or of a political subdivision within the State; and, we summarized the General Assembly's enactment of Anton's Law, aimed, in relevant part, at removing records pertaining to any allegation or investigation of police misconduct, including discipline records, from the MPIA's personnel records exemption. At the threshold of our analysis, we must first consider whether the records at issue fall within the category of records normally protected from disclosure as "personnel records" before we examine whether they qualify as records expressly removed from the "personnel records" exemption

34

under Anton's Law. Therefore, we turn to examine the language, statutory framework, and decisional law construing the MPIA's personnel records exemption.

Again, following the enactment of Anton's Law, the statute provided:[16]

**§ 4-311. Personnel records**

(a) Subject to subsection (b) of this section, a custodian shall deny inspection of a personnel record of an individual, including an application, a performance rating, or scholastic achievement information.
(b) A custodian shall allow inspection by:
(1) the person in interest;
(2) an elected or appointed official who supervises the work of the individual; or
(3) an employee organization described in Title 6 of the Education Article of the portion of the personnel record that contains the individual's:
(i) home address;
(ii) home telephone number; and
(iii) personal cell phone number.
(c)(1) Except as provided in paragraph (2) of this subsection, a record relating to an administrative or criminal investigation of misconduct by a police officer, including an internal affairs investigatory record, a hearing record, and records relating to a disciplinary decision, is not a personal record for purposes of this section.
(2) A record of a technical infraction is a personnel record for the purposes of this section.

Although the MPIA does not formally define the term "personnel records," the Supreme Court of Maryland expressed that it "do[es] not believe that the General Assembly intended that *any* record identifying an employee would be exempt from disclosure as a personnel record." *Kirwan v. The Diamondback*, 352 Md. 74, 84 (1998) (emphasis in original). Even where the personnel records exemption applies, we have clarified that "the exemption may not be blanketly invoked to shield an entire file if the shielding of only a

---

[16] As previously noted, the statute was further amended in 2024.

part of the file would suffice to serve the purpose of the exemption." *Blythe v. State*, 161 Md. App. 492, 519 (2005); *see also* GP § 4-343 ("[I]f a custodian believes that inspection of a part of a public record by the applicant would be contrary to the public interest, the custodian may deny inspection by the applicant of *that part* of the record[.]") (emphasis added).

Because the MPIA offers no explicit definition of "personnel records," courts have followed the rules of statutory construction to look beyond the plain language of GP § 4-311 to determine whether certain records qualify as personnel records. In *Kirwan v. The Diamondback*, a newspaper company investigated, among other things, an allegation that certain members of the University of Maryland men's basketball team "were parking illegally on campus . . . and were receiving preferential treatment from the University with respect to the parking violation fines imposed." 352 Md. 74, 79 (1998). The newspaper requested "records relating to parking violations committed by Gary Williams," who was the head coach of the men's basketball team at the time, but the University denied the request, citing the MPIA's personnel records exemption. *Id*. at 79-80. In concluding that records relating to the coach's parking tickets did not qualify as personnel records and therefore were not exempt from disclosure under the MPIA, the Supreme Court of Maryland reasoned:

> [T]he language of [GP § 4-311(a)])[17] discloses what type of documents the
> Legislature considered to be personnel records. The statute lists three

---

[17] At the time of the decision in *Kirwan*, the MPIA was codified in Sections 10-611 through 10-628 of the State Government Article of the Maryland Code. In 2014, the General Assembly added the General Provisions Article to the Code of Maryland. *See*

(Continued)

categories of documents which are: (1) an application for employment; (2) performance rating; and (3) scholastic achievement. **Although this list was probably not intended to be exhaustive, it does reflect a legislative intent that "personnel records" mean those documents that directly pertain to employment and an employee's ability to perform a job.** Whether Coach Williams received parking tickets has little or nothing to do with his employment, his status as an employee, or his ability as a coach. It means only that he was alleged to have parked illegally.

\* \* \*

[T]he policy of the Public Information Act is to allow access to public records. **Generally, the statute should be interpreted to favor disclosure. In light of this policy, we do not believe that the General Assembly intended that *any* record identifying an employee would be exempt from disclosure as a personnel record. Instead, the General Assembly likely intended that the term "personnel records" retain its common sense meaning.** This is indicated by the list following the prohibition on the release of the personnel records. The release of information regarding parking tickets accumulated by Coach Williams is not within the personnel records exemption contained in the statute.

352 Md. 74, 82-84 (emphasis added).

In considering whether a record qualifies as a personnel record under the MPIA, we may evaluate its purpose and use to see if the use is more investigatory in nature. In *Montgomery Cnty. Maryland v. Shropshire*, 420 Md. 362, 382-83 (2011), the Supreme Court of Maryland performed this analysis by comparing the facts in that case to those in in *Maryland Dep't of State Police v. Maryland State Conference of NAACP Branches*, 190 Md. App. 359 (2010). The records sought in *Shropshire* related to an internal affairs investigation into a specific traffic accident where two officers were accused of violating administrative policies. *Shropshire*, 420 Md at 364. The records contained "significant

2014 Md. Laws, ch. 94. The MPIA was relocated to this new article and renumbered to GP § 4-101 *et seq. Id.*

37

personal information" and were limited to a "discrete" incident. *Id.* at 381, 382. The Court framed the issue presented as: "whether the records of the internal affairs investigation in issue are deemed 'personnel records' and not disclosable or are records of 'investigations' and the subject of discretionary disclosure" under GP § 4-351(d) (formerly codified at Maryland Code, State Government Article ("SG"), section 10-618(f)). *Id.* at 377-78.

The *Shropshire* Court noted that the records sought in *NAACP Branches* focused less on the individual officers and more on broader misconduct. *Shropshire*, 420 Md. at 382. In *NAACP Branches*, reports of racial profiling by officers were "stored in a central location" and were not "indexed by name of the [officer] or by the [officer]'s identification number." *Id.*; *see also NAACP Branches*, 190 Md. App. at 374. The *Shropshire* Court reasoned that because the records in *NAACP Branches* dealt with a "systemic" issue, the use of the records was much more "significant in the aggregate" and it was more likely that the records were used to "provide statistical information, rather than pertaining to [personnel issues]." *Shropshire*, 420 Md. at 382. In contrast, the *Shropshire* records were far narrower in scope and were not useful in the aggregate. *Id.* 382-83. Accordingly, the Court in *Shropshire* classified the records as personnel records and not subject to disclosure. *Id.*

In support of our holding in *NAACP Branches* that the investigatory files at issue did not qualify as "personnel records" under the MPIA, we reasoned, in part, that the files related to racial profiling complaints "do not involve private matters concerning . . . the trooper's private life[,]" but rather, "concern public actions by agents of the State concerning affairs of government, which are exactly the types of material [the MPIA] was

38

designed to allow the public to see." 190 Md. App. at 368. Although the Supreme Court of Maryland affirmed this Court's judgment in *NAACP Branches*, the Supreme Court pronounced several important clarifications regarding the interrelationship between the personnel records exemption and other provisions of the MPIA. *Md. Dept. of State Police v. Md. State Conf. of NAACP Branches*, 430 Md. 179, 193-96 (2013). Pertinent to the instant appeal, the Supreme Court disagreed with this Court's reasoning that if the records constituted investigative records under what is now GP § 4-351, then they could not also be exempt from disclosure under the personnel records exemption (GP § 4-311). *Id.* at 193. The Supreme Court repeated its instruction in *Attorney General v. Gallagher* that "'[n]othing in the language or history of the Public Information Act supports the view that, when records are contained within an investigatory file, § 10-618(f)(2) [(currently, GP § 4-351(a)(2))] displaces all other exemptions in the statute.'" *Id.* at 192 (quoting *Office of the Att'y Gen. v. Gallagher,* 359 Md. 341, 348 (2000)). To suggest otherwise, the Supreme Court pointed out, would mean that documents that are privileged and exempt from disclosure, such as those containing attorney work product, could be disclosed simply because they are part of an investigatory file. *Id.* at 192.

The above clarification pronounced by the Supreme Court in *NAACP Branches* is critical in understanding the application of Anton's Law. With the passage of Anton's Law, the General Assembly expressly removed from the MPIA's personnel records exemption any "record relating to an administrative or criminal investigation of misconduct by a police officer, including an internal affairs investigatory record, a hearing record, and records relating to a disciplinary decision." GP § 4-311(c)(1). The General Assembly did

39

not reclassify these records under GP 4-351(a)(4) without first removing them from the mandatory exemption under GP § 4-311(a). Thus, records contained in an investigatory, hearing, or disciplinary file subject to review under GP § 4-351(a)(4)—that may previously have been protected from disclosure because they qualified as personnel records—will no longer qualify as personnel records protected from disclosure under the MPIA. However, the Supreme Court's opinion in *NAACP Branches* teaches that other compulsory exemptions and redactions may still apply. 430 Md. at 195-96. More precisely, records that fall within the category defined under GP § 4-311(c)(1), while subject to "discretionary" review under GP § 4-351(a)(4), may also contain documents or portions of documents that are protected from disclosure under other provisions of the MPIA, such as "shielded records" under GP § 4-327. Indeed, Anton's Law amended GP § 4-351 to specify that records custodians "shall" redact portions of any such records that contain "medical information[,] . . . personal contact information[,] . . . or information relating to the family" of the subject of the records requested. GP § 4-351(d)(1).

## C. Analysis

First, we examine whether OCPD's UOF Reports fall within the category of records protected from disclosure as "personnel records" under GP § 4-311(a). Next, we must decide whether the UOF Reviews qualify as records expressly removed from the "personnel records" exemption under GP § 4-311(c)(1). Finally, we must consider whether all of the records at issue should be released in their entirety to the Post without any redaction as ordered by the circuit court.

40

Ocean City had the burden of proving that including the names of the officers in the UOF Reports would have converted them into "personnel records" exempt from disclosure under GP § 4-311(a). *NAACP Branches*, 430 Md. at 191. Before the circuit court, Ocean City admitted that the reports do not hold any disciplinary information or information pertaining to the reporting officers' employment status. And no one has suggested that a UOF Report constitutes an application, a performance rating, or a record of scholastic achievement. *See Kirwan*, 352 Md. at 82.

The record establishes that UOF Reports are not created by supervisory officers for performance evaluation purposes. Instead, they are created, in compliance with PS § 3-514 and OCPD policy, by the officers themselves as the uses of force occur. We agree with the circuit court's observation that "the primary purpose of the collection and compilation of the data" is to comply with the requirements of PS § 3-514. As the trial court correctly noted, viewing the data entry fields in the BlueTeam program's Use of Force module, "there is no provision for the officer to provide a narrative of the encounter and the information collected is fairly characterized as basic, factual, straightforward and objective data emanating from a job-related event involving an officer and a member of the public."

Salient in our analysis is the fact that OCPD policy requires officers to complete an Incident Report *and* enter a UOF Report into the BlueTeam program after every use-of-force incident. OCPD admits that Incident Reports are not considered personnel records and are typically made available upon request. As noted above, Incident Reports contain the names of the officers and far more detail about each use-of-force incident than UOF

41

Reports. We conclude that the OCPD has failed to identify the distinguishing feature in UOF Reports, including the names of the officers who filed them, that renders them exempt from disclosure under GP § 4-311(a).

Although Ocean City baldly claims that the UOF Reports are used to document officer performance, there is no evidence in the record that UOF Reports are included in OCPD personnel files. According to the process as described by OCPD, it is only as the UOF Reports make their way up the chain of review that information concerning officer performance is added by reviewing officers, but then the files become what OCPD has defined as UOF Reviews. In any case, Ocean City does not point to any instance in which the information entered by an officer in a UOF Report resulted in disciplinary action, promotion, or any other change in employee status.

The core purpose of UOF Reports, as outlined by OCPD's own policy, is to "aggregate" data to evaluate signs of trends in police interactions with citizens and to ensure compliance with OCPD policy and statutory reporting obligations. As the Supreme Court observed in *Montgomery Cnty. Maryland v. Shropshire*, the records are used to "provid[e] statistical information, rather than pertaining to [personnel issues]." 420 Md. 362, 382 (2011).

Ocean City's reliance on this Court's decision in *Baltimore Action Legal Team v. Office of State's Attorney of Baltimore* is misplaced. 253 Md. App. 360 (2021). In that case, Baltimore Action Legal Team ("BALT") requested a list of police "officers with questionable integrity" that the Baltimore State's Attorney, with no supervisory authority over the police officers, stated that she maintained. *Balt. Action Legal Team*, 253 Md. App.

42

at 368.  We held that the list was not exempt from disclosure under the MPIA as a personnel record or as attorney work-product. *Id.* at 369.  We explained that an agency cannot claim an exemption for personnel records under the MPIA "unless [] the agency has supervisory authority both over the records and the person who is the subject of the records," *and* "the records contain what would be considered 'personnel issues,' such as a performance rating or, generally, 'an employee's ability to perform a job.'" *Id.* at 381 (quoting *Kirwan v. The Diamondback*, 352 Md. 74, 83-84 (1998)).  We observed that "the legislature did not intend that 'any record identifying an employee would be exempt from disclosure as a personnel record.'" *Id.* at 382 (quoting *Kirwan*, 352 Md. at 83-84).

Ocean City cites to the following sentence from our opinion: "[w]e could easily envision a comparable 'do not call' list created and maintained by the City's police department, but that is not the case here." *Id.* at 382-83.  The dicta that Ocean City points to, however, merely relates a factual observation and does not state or imply that a similar list maintained by the City's police department would constitute a personnel record that could properly be withheld.  Moreover, Ocean City's reading ignores the instruction that the list "does not contain the personnel record of an individual, such as 'an application, performance rating, or scholastic achievement information,' or other information directly related to an officer's job performance." *Id.* at 381-82 (quoting GP § 4-311(a)).

Our sister states have addressed whether similar records are exempt from disclosure within the parameters of their public information statutes.  These cases are instructive because they provide examples for how use of force reports should be handled within statutory regimes that favor disclosure of government records.

43

In New York, the Appellate Court, Third Division, addressed whether unredacted New York State Department of Corrections records—including use of force reports generated by corrections officers—sought under New York's Freedom of Information Law ("FOIL"), N. Y. Public Officer Law (Pub. Off. L.) §§ 84-90, were "'personnel records' exempt from disclosure under N. Y. Pub. Off. L. § 87(2) and Civil Rights Law § 50-a(1)." *Prisoners' Legal Servs. of New York v. New York State Dep't of Corr. & Cmty. Supervision*, 98 N.Y.S.3d 677, 678 (App. Div. 2019). In that case, the Department of Corrections objected to providing these records to a non-profit organization, citing the state's personnel records exemption under N.Y. Civ. Rights L. § 50 (a)(1).[18] *Id*. The court held that the unredacted records were not exempt from disclosure under FOIL, N. Y. Pub. Off. L. § 87(2), and N. Y. Civ. Rights L. § 50-a(1). *Id*. at 682, 679. In reaching this decision, the court balanced FOIL's "broad mandate" and "legislative policy favoring disclosure" with the need to "safeguard against potential harassment of officers through unlimited access to . . . personnel files[.]" *Id.* at 679-80 (quoting *Matter of Daily Gazette Co. v. City of Schenectady,* 688 N.Y.S.2d 472, 155 (App. Div. 1999)). During an "in camera review of a sampling of the requested documents[,]" the court observed that the records were "factual [in] nature[,]" and "more akin to arrest reports, stop reports, summonses, accident reports

---

[18] At the time of the FOIL requests, N.Y. Civ. Rights L. § 50 (a)(1) designated "personnel records" of police officers and other public employees as "confidential and not subject to inspection or review without [] express written consent of such police officer." N.Y. Civ. Rights L. § 50(a)(1) was repealed by L.2020, c. 96 § 1, effective June 12, 2020.

New York's FOIL at N.Y. Pub. Off. L. § 87(2) instructs state agencies to "make available for public inspection . . . all records" subject to enumerated exceptions and necessary redactions.

44

and body-worn camera footage, none of which is quintessentially 'personnel records.'" *Id.* at 681 (citations omitted). Ultimately, the court determined that the nature and uses of the use of force reports and other requested records, "as well as their lack of potential to be used abusively against correction officers . . . [did] not qualify [the documents] as personnel records" under the applicable statutes. *Id.* at 682.

Similarly, the Supreme Court of Iowa held that use of force reports created by officers from the Des Moines Police Department were not exempt from disclosure under Iowa's Open Records Act, Iowa Code § 22.7, citing the Act's "liberal policy in favor of access to public records." *Harrison v. Mickey*, 18 N.W.3d 477, 487, 482 (Iowa 2025), *as amended* (May 15, 2025) (quoting *Milligan v. Ottumwa Police Dep't*, 937 N.W.2d 97, 102 (Iowa 2020)). In that case, Harrison, the founder of a non-profit organization, sought "387 use of force reports referenced in" the Des Moines Police Department's 2020 annual summary report. *Id.* at 480. The Department claimed the use of force reports were generated through officers' "self-review[s]" and, therefore, they constituted personnel records exempt from disclosure. *Id.* at 481. As in *Prisoners' Legal Servs.*, 98 N.Y.S.3d at 681, the Supreme Court of Iowa considered the content of the records in deciding that the statute required their disclosure, highlighting that the reports "are reports of facts, not evaluations of employees." *Id.* at 479. Although the Supreme Court of Iowa held the "use of [force] reports for 2020 should be produced[,]" the court also noted that a redaction of the reports "might be justified" to "protect[] the rights of a juvenile" or necessary on "some other grounds." *Id.* at 486-87.

The Supreme Court of Arkansas considered the impetus for the creation of the use of force reports by the Little Rock Police Department relevant in its decision to order disclosure of use of force reports pursuant to an Arkansas Freedom of Information Act ("FOIA") request. *Thomas v. Hall*, 399 S.W.3d 387, 388 (Ark. 2012). Resembling the MPIA, Arkansas's FOIA embraces a policy favoring disclosure, but also provides for mandatory exemptions for certain documents such as personnel records. *Id*. at 390-91; Ark. Code § 25-19-105(c)(1). In *Thomas*, Hall sought records relating to a single incident involving a specific officer, including four use of force reports created pursuant to a Little Rock Police Department Policy. *Id*. at 388-89. The Chief of Police, as records custodian for the Little Rock Police Department, "withheld all four [use of force] reports[,]" claiming that the reports were personnel records created for purposes of officer evaluation. *Id*. at 389-90. The Supreme Court of Arkansas concluded that use of force reports created at the direction of the employer do not rise to the level of personnel records because the use of force reports were part of an officer's "routine[] . . . course of [] dut[y,]" and this distinction creates "an exception to the [personnel record] exemption[.]" *Id*. at 393.

The facts presented in the foregoing cases parallel those presented in the underlying case in many respects. The police officers or correctional officers created fact-focused use of force reports in the ordinary course of their duties—corresponding to the UOF Reports generated by OCPD officers in accordance with OCPD policy and the reporting requirements of PS § 3-514. In each case, agencies resisted disclosing these records under their corollary public information acts on the ground that they constituted personnel records. In the exemplar cases, our sister states concluded that the use of force reports

46

were not personnel records, determining instead that the application of each state's respective public information act warranted disclosure of the reports. We agree that routine use of force reports authored by officers in compliance with public reporting requirements do not constitute personnel records.[19]

In sum, Ocean City failed to demonstrate that including the names of officers in the UOF Reports would convert them into "personnel records" exempt from disclosure under the MPIA. We hold that the UOF Reports, including the names of the officers who filed them, are not exempt from disclosure as personnel records under GP § 4-311(a) because: 1) they are created to meet statutory reporting requirements and not created in a performance review setting; 2) they are not used as personnel records; and, 3) officers do not have a reasonable expectation of privacy in the information contained in the UOF Reports given that the OCPD makes available, upon request, the more detailed Incident Reports that correspond to each UOF Report.

### UOF Reviews

The parties agree that the UOF Reviews related to the June 2021 and May 2020

---

[19] Other jurisdictions reached similar determinations when addressing challenges to the disclosure of use of force reports. *See City of San Antonio v. San Antonio Exp.-News*, 47 S.W.3d 556, 564-65 (Tex. App. 2000) (concluding "[u]se of [f]orce reports are administrative in nature" and "subject to disclosure" as public records); *State ex rel. J./Sentinel, Inc., Anne Bothwell v. Philip Arreola, Chief of Police, City of Milwaukee*, 558 N.W.2d 670, 679 (Ct. App. 1996) (ordering disclosure of use of force reports after statutorily mandated redactions).

incidents are personnel records if they are not covered by Anton's Law.[20] We now examine whether the circuit court correctly determined that the UOF Reviews constitute records of administrative investigations of police misconduct that fall under the category of records described in GP § 4-311(c) and GP § 4-351(a)(4).

Beginning with the use-of-force incident on May 31, 2020, the Post reported that, according to police officials, Lt. Wrench was "cleared of wrongdoing." In regard to the June 2021 use-of-force incidents, the OCPD issued a public statement on June 14, 2021, informing the public that the incidents were "being *investigated* by the Office of Professional Standards." (Emphasis added). Later, Mayor Meehan informed U.S. Senator Chris Van Hollen's office via email that OCPD was performing an "internal review." Lt. Soscia explained during his deposition that the "internal review" reference must have been to the BlueTeam program's chain of command review of the UOF Reports because "there was never a referral to internal affairs or []anything that would arise to the level of a separate internal investigation."

It is evident that Ocean City intended the public to understand that these very high-profile incidents of use of force by the OCPD were under investigation. According to the record, there was no review of these use-of-force incidents by Ocean City other than the UOF Reviews, making the UOF Reviews the only investigatory documents available for potential disclosure. In fact, Lt. Soscia testified that he was not aware of *any* separate

---

[20] The parties agreed before the circuit court that the UOF Reviews *are* personnel records but disagreed as to whether they were covered by Anton's Law. We reframe the issue slightly because, if the records are covered by Anton's Law, then, as expressed in GP § 4-311(c), the "records *are not* personnel records[.]" GP § 4-311(c) (emphasis added).

disciplinary action or investigation opened as a result of *any* UOF Review.  We agree with the circuit court's observation that a UOF Review, "as contemplated by the OCPD's standard operating procedures, could result in a disciplinary decision[,]" and that, "[t]he fact that the use of force review process generally, and the OPS specifically, have not been used to their full investigatory and disciplinary capacity does not negate their inherent investigatory and disciplinary authority."

Ocean City contends that the UOF Reviews are not tied to misconduct and therefore fall outside the scope of Anton's Law.  Ocean City narrowly construes the term "misconduct" to include only those actions tethered to a "complaint . . . lodged by a citizen or an OCPD police officer[.]"  The plain language of the amendments to the MPIA under Anton's law, however, do not support Ocean City's narrow construction.

Section 4-311(c)(1) covers any "record relating to an administrative or criminal investigation of misconduct by a police officer, including an internal affairs investigatory record[,] a hearing record[,] and records relating to a disciplinary decision."  GP § 4-311(c)(1).  If the General Assembly wanted to specify that the records relating to misconduct must be generated by a complaint filed by a citizen or another officer, or that they only include records where allegations of misconduct were sustained, it could have done so. *Cf. SVF Riva Annapolis LLC. v. Gilroy,* 459 Md. 632, 640 (2018) (explaining that statutory interpretation requires the court to assume that the language of the statute reflects the intent of the Legislature).  It is not within our power as an appellate court to "add words to the statute that are not there." *Baires v. State*, 249 Md. App. 62, 80 (2021); *see also City of Brunswick et al. v. Handler*, --- Md. App. ---, No. 1437, Sept. Term, 2024, slip op. 7-8

49

(Md. App. _____) (declining to add language to a statute even in cases where the court determines "'that an omission from a statute was inadvertent'") (quoting *Rosemann v. Salsbury, Clements, Bekman, Marder & Adkins*, LLC, 412 Md. 308, 327 (2010)).

As noted previously, we do not confine our review of GP § 4-311(c)(1) "'to the isolated section alone[,]'" *Open Just. Balt.*, 485 Md. at 647 (quoting *Lockshin v. Semsker*, 412 Md. 257, 275 (2010)), but rather, we consider its plain language "within the context of the statutory scheme to which it belongs[.]" *Lockshin*, 412 Md. at 275. Importantly, with the passage of Anton's Law, the General Assembly created an exception to GP § 4-311(c)(1) under subsection (c)(2) which states that "a record of a technical infraction **is** a personnel record for the purposes of this section." GP § 4-311(c)(2) (emphasis added). Concomitantly, the General Assembly amended the MPIA to include the following definition for "technical infraction":[21]

**§ 4-101. Definitions.**
> (l) "Technical infraction" means a minor rule violation by an individual solely related to the enforcement of administrative rules that:
>> (1) **does not** *involve an interaction between a member of the public and the individual*;
>> (2) **does not** relate to the individual's investigative, enforcement, training, supervision, or reporting responsibilities; and
>> (3) **is not** otherwise a *matter of public concern*.

GP § 4-101(l) (emphasis added). Because GP § 4-311(c)(2) specifies what qualities a technical infraction, as an exception to § 4-311(c)(1), *does not* have, we can deduce that § 4-311(c)(1) applies to those instances in which the same qualities *are* present. In other words, the language of § 4-311(c)(2) suggests that the General Assembly intended GP § 4-

---

[21] This provision was not further amended in 2024.

311(c)(1) to apply to a record relating to an investigation of misconduct by a police officer that *does* "involve an interaction between a member of the public and the [OCPD officer];" *does* "relate to the [OCPD officer's] investigative, enforcement, training, supervision, or reporting responsibilities; and," *is* "otherwise a matter of public concern." GP § 4-101(l). All three UOF Reviews concern highly publicized use-of-force incidents that occurred on the boardwalk in Ocean City and involved interactions between OCPD officers and members of the public. All three UOF Reviews were initiated by the officers as UOF Reports pursuant to their reporting responsibilities.

Although the MPIA does not define police "misconduct," the General Assembly added the definition in the Public Safety Article under a companion bill that, together with Anton's Law and several other bills, formed the Maryland Police Accountability Act of 2021. As we note above, PS § 3-101(g) defines "police misconduct" as "a pattern, [] practice, or conduct by a police officer or law enforcement agency" that "depriv[es] persons of rights[,] . . . violat[es] . . . a criminal statute[,]" or "violat[es] . . . law enforcement agency standards and policies." PS § 3-101(g); *see* H.B. 670, 2021 Leg., 442d Sess. Again, we see nothing in this definition that limits the term to include only conduct based on a complaint filed by a citizen or a police officer. At bottom, we find no support for OCPD's narrow interpretation of Anton's Law and decline to apply it here.

The overarching goal of Anton's Law made plain by the language of the amendments to the MPIA under Anton's Law, is to make records regarding "investigations of police misconduct" publicly available. GP § 4-311(c). The circuit court's determination that the UOF Reviews meet the criteria of GP § 4-311(c) aligns with the purpose of Anton's

51

Law and is consistent with PS § 3-514, which requires police departments throughout the State to report annually on every use of force exerted on a citizen by an officer. The legislative purpose of Anton's Law would be stymied by the review process OCPD employs in use-of-force cases if we read GP § 4-311(c) to apply only to investigations that are based on complaints. The three use-of-force incidents that are the subject of this appeal illustrate this point. In each case there was no apparent need for citizens to file a complaint given OCPD's assurances that the matters were being investigated. Similarly, there was no reason for another officer to file a complaint, knowing that the UOF Reports and their companion Incident Reports are reviewed up the chain of command. Thus, as the circuit court observed, "in the absence of a civilian complaint, OCPD, in its sole prerogative, determines whether important UOF Reviews are exempt from public scrutiny." We agree with the circuit court that this would frustrate the purpose of Anton's Law, especially considering the unrefuted testimony that OCPD is "unaware of any disciplinary action taken or investigations opened as a result of UOF Reviews."

Under Anton's Law, the public is equally entitled to information showing that the UOF Reviews at issue did not result in any investigation within OPS or any disciplinary action. The Supreme Court of Maryland has recognized that the public's crucial oversight role is aided by gaining access to records of incidents that do not result in findings of misconduct or result in discipline. *Balt. Police Dep't v. Open Just. Balt.*, 485 Md. 605, 663-64 (2023) (demonstrating that "the public interest purpose" of disclosing records "intended to assist the public in examining [police] compliance with . . . internal investigatory policies" was "plainly apparent.").

52

Our analysis of Anton's Law and the record on appeal leads us to conclude that the BlueTeam program's chain of command reviews constitute internal investigations both in function and through Ocean City's own representations to the public. The reviews memorialize internal reviews of instances of uses of force by officers in their interactions with the public, placing them within the category of records defined under GP § 4-311(c). Accordingly, we hold that the UOF Reviews may not be withheld from public disclosure under the MPIA on the ground that they constitute personnel records.

In surveying other states, we have found some that have amended their public information laws to mandate, in varying degrees, disclosure of use-of-force records under statutes akin to GP §§ 4-311 and 4-351. Some states take an expansive approach to the disclosure of police personnel records. In 2020, the State of New York completely repealed its statute exempting personnel records of police officers, including disciplinary records,[22] from disclosure under the state's Freedom of Information Law, except where "there is a particularized and specific justification for such denial" including "personal privacy" or where disclosure would "interfere with law enforcement investigations or . . . proceedings."[23] N.Y. Public Officer Law §§ 87(2), 87(2)(i); *see Abbatoy v. Baxter*, 210 N.Y.S.3d 555 (2024) (explaining the repeal of the exemption). Other states employ a

---

[22] As noted previously, technical infractions by police officers remain part of undisclosed personnel records in Maryland following the Anton's Law amendments to GP § 4-311. Although New York laws do not fully shield technical infractions from disclosure, those infractions are subject to discretionary redaction prior to disclosure of the officer's personnel file. N.Y. Pub. Off. L. § 89(2)(c).

[23] *See* note 18 *supra* and accompanying text.

narrower approach.  For example, in 2018, California amended its peace officer and custodial officer personnel record statute, codified at Cal. Penal Code § 832.7,[24] to make *any* record relating to "the discharge of a firearm[]" or the use of force "result[ing] in death or great bodily injury" available for public inspection pursuant to the California Public Records Act.[25] *See generally Becerra v. Superior Ct.*, 44 Cal. App. 5th 897 (2020).  Maine and Wisconsin, on the other hand, permit the disclosure of police misconduct investigation records under a public records request, however, *only* once the investigation is completed. *See* Me. Rev. Stat. tit. 30-A, § 2702; Wis. Stat. § 19.36 (10)(b).  Each of the foregoing states permits records custodians to redact specific information comparable to the redactions required in GP § 4-351(d). *See* CA Penal Code §832.7(6)-(7); N.Y. Pub. Off. L. §§ 87(2), 89(2); Me. Rev. Stat. tit. 1, § 408-A(4-A) (allowing for redaction by records custodian); Wis. Stat. §19.36.

In 2022, Ohio's highest court addressed a case bearing a close resemblance to the instant appeal.  In *State ex rel. Standifer v. Cleveland*, 213 N.E.3d 665, 666-67 (Ohio 2022), a newspaper reporter filed public records requests for all documentation related to uses of force by police in the City of Cleveland.  As in Ocean City, the Cleveland use of force reports were "entered into . . . IAPro/BlueTeam" where department policy "require[d]

---

[24] Cal. Penal Code § 832.7 was amended by Stats. 2018, c. 988 (S.B. 1421), § 2, eff. Jan. 1, 2019.

[25] The California Public Records Act is codified at Cal. Gov't Code § 7920.000.

review[26] of UOF reports through the chain of command to determine whether a use of force was proper." *Id*. at 667. The Supreme Court of Ohio considered whether the reports with their related review documentation were public records subject to disclosure under Ohio Rev. Code § 149.43(1) or if the records fell under the "confidential law enforcement investigatory record" exemption.[27] *Id*. at 666; Ohio Rev. Code § 149.43(2)(a). The court reasoned that the requested records were not subject to the exemption for two main reasons. *Id*. at 671. First, the records "are part of the investigation conducted into an officer's use of force" and, therefore, "pertain to a law-enforcement matter and cannot be characterized as simply a personnel document." *Id*. at 669. Second, the court was not persuaded by Cleveland's argument that the reviews *may* contain statutorily exempted confidential information and therefore a blanket exemption was proper. *Id*. at 670-71. Accordingly, the court ordered the disclosure of the use of force reports and reviews subject to redaction. *Id*. at 671. As in *Standifer*, the OCPD policy dictates a "chain of command" review process for each report of the use of force by a police officer, *id*. at 667, and the review process is

---

[26] At both the intermediary appeal stage and before the Supreme Court of Ohio, the review portions of the reports—what we refer to as the UOF Reviews in the instant appeal—were considered part of the documentation sought by the reporter through the public records request. See *State ex rel. Standifer v. Cleveland*, 213 N.E.3d 665, 667 (Ohio 2022); *State ex rel. Standifer v. Cleveland*, 2021-Ohio-3100, 2021 WL 4126923 at *3 (Ohio Ct. App., Sept. 3, 2021), *rev'd and remanded*, 213 N.E.3d 665 (Ohio 2022).

[27] The Supreme Court of Ohio's decision in *Nat'l Broad. Co., Inc. v. Cleveland*, 566 N.E.2d 146 (1991), established that use of force reviews, as implemented and used by the City of Cleveland, "more closely resembled 'records compiled pursuant to criminal investigations that police routinely perform when they investigate crimes'" than personnel records. *Standifer*, 213 N.E.3d at 669 (quoting *Nat'l Brod. Co.*, 566 N.E.2d at 148).

55

investigatory in nature, *id*. at 669.

We observe that the call for access to records related to uses of force by law enforcement is consistent across the foregoing jurisdictions, regardless of the different approaches each state may take in mandating disclosure. Our survey of cases from these jurisdictions, especially the Supreme Court of Ohio's decision in *Standifer*, lends support to our holding that UOF Reviews may not be withheld from public disclosure on the ground that they constitute personnel records.

In summary, we hold that the records of the UOF Reviews regarding the June 2021 and May 2020 incidents constitute administrative investigatory records of police misconduct that are, following the enactment of Anton's Law, expressly removed by GP § 4-311(c) from the MPIA's personnel records exemption.

### *On Remand Review*

Although we affirm the circuit court's determination that the UOF Reviews are not protected from disclosure under GP § 4-311(c), we vacate the court's order requiring the release of the UOF Reviews to the Post in their entirety. We do not intend the holdings reached in this case to suggest that under Anton's Law, the Post is granted unfettered access to UOF Reports and UOF Reviews. On the contrary, Anton's Law *requires* review and, where necessary, redaction of portions of such records prior to disclosure. GP § 4-351(d).

The unredacted UOF Reports at issue in the instant appeal were already produced, apart from the names of the officers. For this reason, we affirm the order of the circuit court compelling the disclosure of the UOF Reports with officers' names.

On the other hand, we must vacate that part of the circuit court's order requiring OCPD to release the UOF <u>Reviews</u> to the Post.  Nothing in the record indicates that the UOF Reviews have been reviewed by the records custodian, or the court *in camera*, for mandatory redactions of "medical information[,] . . . personal contact information of the person in interest or a witness[,] . . . or information relating to the family" of the subject of the records requested.  GP § 4-351(d).  To fully comply with the MPIA as amended by Anton's Law, the OCPD records custodian must have an opportunity to make these mandatory redactions to the UOF Reviews as instructed by GP § 4-351(d)(1).  Under GP § 4-301, the records may also be subject to denial and redaction if the records, or any portions thereof, are by law deemed privileged or confidential, or where their inspection would otherwise be contrary to the Maryland Rules, an order of a court of record, or any applicable federal or state statute or regulation.  In addition to the mandatory redactions provided for in GP § 4-351(d)(1) and GP § 4-301, the records custodian may also withhold "part of the record" where the "custodian believes that inspection . . . would be contrary to the public interest[,]" GP § 4-343, or where witness information "other than personal contact information" is included.  GP § 4-351(d)(2).  These redactions and discretionary denials are consistent with our decisional case law construing the MPIA which "'requires agencies to utilize the principle of severability in responding to requests for public records.'" *Balt. Action Legal Team v. Off. of State's Att'y of Balt. City*, 253 Md. App. 360, 384 (2021) (quoting *Cranford v. Montgomery Cnty.*, 300 Md. 759, 774 (1984)).

## *Conclusion*

We hold that the circuit court correctly determined that the UOF Reports do not constitute "personnel records" under the MPIA and, along with the names of the officers, are subject to disclosure. Accordingly, we affirm the circuit court's grant of summary judgment in favor of the Post on Count I of the Amended Complaint.

We affirm, in part, and vacate, in part, the circuit court's grant of summary judgment in favor of the Post on Count II of the Amended Complaint. We hold that the circuit court correctly determined that the UOF Reviews, as described in the record, qualify as records expressly removed from the personnel records exemption under GP § 4-311(c)(1). However, we hold that the circuit court erred in requiring OCPD to release the requested UOF Reviews to the Post before the records custodian and the court, following *in camera* review, had the opportunity to examine the records to ensure that no portion is exempt from disclosure, or should be redacted, under any applicable provision of the MPIA, including GP § 4-351 as amended by Anton's Law. Therefore we remand the case to the circuit court with instructions to allow the OCPD's custodian of records to review the UOF Reviews as investigative records that fall under the category of records described in GP § 4-311(c) and GP § 4-351(a)(4). In so doing, the records custodian must consider whether all or a portion of the UOF Reviews are subject to: 1) redaction under GP § 4-351(d); 2) any other applicable provisions of the MPIA that require the custodian to deny inspection or redact certain information; or 3) discretionary denials under GP §§ 4-343 and 4-351. Under GP § 4-301, the requests for their inspection by the Post remain subject to denial and redaction if the records, or any portions thereof, are by law deemed privileged or confidential, or

58

where their inspection would otherwise be contrary to the Maryland Rules, an order of a

court of record, or any applicable federal or state statute or regulation.

> **JUDGMENT OF THE CIRCUIT COURT FOR WORCESTER COUNTY AFFIRMED IN PART AND VACATED IN PART. CASE IS REMANDED TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE DIVIDED EVENLY BETWEEN THE PARTIES.**